IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

|  |  |  |
|---|---|---|
| **BRIAN ENTWISTLE** <br> 1442 David Swann Drive <br> Dandridge, Tennessee 37725 <br> <br> Plaintiff, <br> <br> v. <br> <br> **ABX AIR, INC**. <br> 145 Hunter Drive <br> Wilmington, OH 45177 <br> <br> Also serve Statutory Agent: <br> The Prentice-Hall Corporation System, Inc. <br> 50 West Broad Street, Suite 1800 <br> Columbus, OH 43215 <br> <br> Defendant. | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : | Case No.: <br> <br> Judge <br> <br> <br> **COMPLAINT** <br> <br> **JURY DEMAND ENDORSED HEREON** |

## Introduction

1. Plaintiff brings this civil action is pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12117 and Ohio law.  Plaintiff, a commercial airline pilot, suffered discrimination on the basis that he was perceived as having a disability: namely depression.

## Parties, Personal Jurisdiction and Venue

2. Plaintiff Brian Entwistle is an individual residing in Dandridge, Jefferson County, Tennessee.

3. Defendant ABX Air, Inc. ("ABX") is a corporation organized under the laws of the State of Delaware and maintains its principal place of business in Wilmington, Clinton County, Ohio, which is located in this judicial district and division.

4. This Court has personal jurisdiction over the Defendant.

5. This action arises from an employment relationship centered in, among other places, Wilmington, Ohio.

6. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) as the sole Defendant in this action resides here and 28 U.S.C. § 1391(b)(2) as a substantial part of the events giving rise to this action occurred here.

## Subject Matter Jurisdiction

7. This employment discrimination action is brought pursuant to the ADA and therefore "aris[es] under the Constitution, laws, or treaties of the United States." This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

8. With respect to Plaintiff's claims under Ohio law, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) as they form part of the same case or controversy

9. All conditions precedent to jurisdiction under § 706 of Title VII, 42 U.S.C. § 2000e-5, have occurred or been complied with:

    a. A charge of discrimination on the basis of disability was filed with the Equal Employment Opportunity Commission ("EEOC") within 180 days of the commission of the unlawful employment practice alleged herein;

    b. A Notification of Right to Sue was received from the EEOC on August 29, 2013 and is attached hereto as **Exhibit 1**;

    c. The complaint in this action has been filed within 90 days from the receipt of the Right to Sue letter.

10. ABX is a "person" within the meaning of the ADA, 42 U.S.C. § 12111(7), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.

11. ABX operates an interstate and international cargo airline for which Entwistle is employed as a pilot. ABX is engaged in an industry that affects interstate commerce within the meaning of the ADA, 42 U.S.C. § 12111(7), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.

12. ABX employs more than 15 individuals and is an "employer" within the meaning of § 101(5)(A) of the ADA, 42 U.S.C. § 12111(5)(A).

### Factual Allegations

13. Entwistle was hired as a pilot by Airborne Express, a predecessor of ABX, in 1997. He flew for eleven years without incident. By 2008, Entwistle had attained the position of first officer of a Boeing 767 aircraft.

14. As a commercial pilot, Entwistle is required to maintain a pilot's license, including a First Class Medical Certificate. Without such a license and certificate, Entwistle is not legally permitted to perform his job responsibilities as a commercial pilot.

15. To maintain a First Class Medical Certificate, pilots must undergo periodic examinations by an Aviation Medical Examiner ("AME").

16. An AME is a private physician with special training authorized by the FAA to act as an AME. Generally, pilots select their own AME from a list of approved doctors.

17. In the fall of 2008, Entwistle began to consistently feel depressed. Entwistle sought medical treatment and was diagnosed with depression.

18. Left untreated, Entwistle's depression can substantially limit his ability to work, interact with others and to carry on with the normal activities of daily life.

19. As part of his medical treatment, Entwistle was prescribed medication.

20. Under doctor's care and with the use of medication, Entwistle's condition is and has been consistently in remission.

21. Nonetheless, pursuant to Federal Aviation Administration ("FAA") regulations in place in 2008, airmen taking Entwistle's medication were ineligible for a First Class Medical Certificate.

22. As a result, in December 2008, Entwistle voluntarily took a leave of absence to address his medical condition.

23. In 2009, while still on medical leave, Entwistle was furloughed from his position along with a number of other pilots.

24. In approximately April 2010, the FAA changed with respect to certain medications, including Entwistle's. Entwistle could now obtain a "special issuance authorization letter" from the FAA allowing him to fly if certain conditions are met.  These conditions can very depending on the specific circumstances of a pilot.

25. Entwistle promptly applied for a special issuance letter, which was granted on July 15, 2011.  Among other conditions, Entwistle was required to "submit to [his] HIMS[1] AME a report from airline management (Chief Pilot or designee) *every 3 months* attesting to [his] competence, crew interaction and mood." (emphasis in original).

26. On July 19, 2011, ABX sent Entwistle a notice recalling him to his position starting on August 9.

---

[1] Human Interaction and Motivation Study, a subset of AME's specially trained to deal with certain medical conditions.

27. Under the terms of the collective bargaining agreement between ABX and its pilots, the company could have issued a "conditional recall" subject to company needs. Because ABX did not do so, Entwistle reasonably understood the July 19 notice as a firm notice of recall.

28. Another airline, Air Transport International ("ATI"), offered Entwistle a position on or about July 21, 2011. According to its terms, Entwistle was required to accept the ATI offer on or before July 29, 2011. If he did not, the offer would expire.

29. ATI is a corporate sibling of ABX, with both airlines headquartered in Wilmington and both having the same corporate parent, Air Transport Services Group, Inc. ("ATSG"). Moreover, both airlines share many of the same senior managers who ultimately report to the Board of Directors of ATSG.

30. Upon information and belief, ABX senior manager were aware of the timing and general nature of employment offers presented by ATI to Entwistle and other ABX pilots.

31. In July 2011, Entwistle contacted ABX's System Chief Pilot Joe Ezell to discuss its recall offer. Entwistle specifically described the status of his First Class Medical Certificate and special issuance authorization.

32. In the same July 2011 conversation, Entwistle also advised Ezell of the open ATI job offer.

33. In the same July 2011 conversation, Ezell advised Entwistle that ABX had changed since 2008 because pilots were flying more frequently to more distant international destinations and "some guys hate it." Ezell suggested that Entwistle should "give serious consideration" to whether ABX was for him. Ezell did not mention the possibility that Entwistle's recall could be later canceled, or that such an action was under consideration. Ezell was not enthusiastic about Entwistle's recall.

34. On July 26, Entwistle accepted ABX's recall offer.

35. On Friday, July 29, 2011, ATI's employment offer to Entwistle expired.

36. On the same day, Ezell mailed a letter to Entwistle and two other crew members informing them that ABX's recall offer was "cancelled." Despite knowing that Entwistle had a time-sensitive employment offer from ATI, Ezell failed to contact Entwistle by phone or email.

37. On July 30, 2011, a Saturday, Entwistle learned of the cancellation from one of the other affected pilots. Entwistle called Ezell's company-issued cellular phone and reached him at home.

38. Ezell confirmed that Entwistle's recall had been cancelled. Entwistle requested that Ezell contact ATI's chief pilot on his behalf and assist in convincing ATI to recognize Entwistle's late acceptance of ATI's job offer, which had expired less than a day earlier.

39. Ezell flatly refused to contact ATI or take any action to assist Entwistle.

40. The July 30, 2011 conversation between Ezell and Entwistle became heated. Entwistle was understandably frustrated with Ezell's previous failure to advise Entwistle that a cancelation was under consideration, failure to immediately contact Entwistle when he learned that the recall had been cancelled and refusal to assist Entwistle obtain employment at ATI.

41. Given the totality of the circumstances, Entwistle's frustration with Ezell was reasonable and understandable.

42. Ezell's treatment of Entwistle with respect to the recall was motivated, at least in part, by animus related to a perceived medical condition.

43. On August 1, 2011, after an intervention from Entwistle's union, ABX rescinded the cancellation and instructed Entwistle to report to work on August 9 as originally scheduled.

44. Despite its knowledge of the July 30 argument between Entwistle and Ezell and having alternative managers available to complete the required reports, ABX assigned Ezell with the task of completing the trimonthly letter.

45. Ezell's first trimonthly report was due on November 30, 2011.  Entwistle reminded Ezell via email on November 14 of the November 30 deadline.

46. When Entwistle reported to his AME on December 13, 2011 for a previously scheduled appointment to renew his medical certificate, he learned that Ezell had not yet submitted the trimonthly report.  Entwistle again emailed Ezell and emphasized the importance of the report.

47. On December 15, 2011, Ezell submitted a late and derogatory report to Entwistle's AME. The negative nature of the report was motivated, at least in part, by animus with respect to Entwistle's perceived medical condition

48. Due to Ezell's late, negative report, Entwistle's AME grounded him pending further evaluation.

49. When Entwistle contacted the crew scheduling department at ABX, he learned that they were already aware of the situation.  Upon information and belief, Ezell had alerted the crew scheduling department that Entwistle would be grounded because this was precisely the result that Ezell hoped to achieve.

50. In February 2012, for the first time, Entwistle was able to obtain the fruits of a months-long letter writing campaign instituted by Ezell with the express purpose of questioning his mental health and undermining his ability to do his job:

    a. On August 10, 2011, the day after Entwistle returned to work at ABX, Ezell wrote a derogatory letter to his own AME, Dr. Paul Terrell, recounting the July 30 argument.  Entwistle had no prior treating relationship with Dr. Terrell and had

7

never met him. Ezell did not inform Entwistle that he was sharing confidential medical information with Dr. Terrell and did not obtain Entwistle's permission before doing so.

b. In response to Ezell's direction, Dr. Terrell wrote the FAA on August 11 "as the Company's medical consultant" enclosing Ezell's August 10 letter and recommending further evaluation of Entwistle's medical condition. Ezell specifically intended Dr. Terrell to take this action.

c. On December 1, Ezell again wrote an unsolicited and unwarranted letter to Dr. Terrell indicating that Ezell continued to have concern over Entwistle's fitness for duty.

d. On December 14, as set forth above, Ezell provided a negative trimonthly report to Entwistle's AME. This is the only correspondence that Ezell was required to complete pursuant to the special issuance medical certificate. Ezell enclosed all of the prior correspondence identified in this paragraph.

51. Ezell's letter-writing campaign identified in the previous paragraph identified only two substantive issues. First, Ezell repeatedly complainsed about the July 30 argument. Second, Ezell objects to a safety report filed by Entwistle concerning in international trip taking place between October 2 and October 4, 2011.

52. In substance, Entwistle suggests that ABX adopt a practice of assigning flight crew members in such a way that at least one of the two pilots operating an aircraft has previous experience with particular "challenging international destinations." Such a practice would reduce the possibility of errors due to unfamiliar destinations and language. Entwistle's safety report was reasonable in substance and tone.

53. Ezell nonetheless characterized Entwistle's safety report as "frivolous" and "baseless." Ezell indicated that "if it were not for his circumstances, [Entwistle] would have been reprimanded." Such a reprimand would not only have been unwarranted, but unlawful. See 49 U.S.C. § 42121.

54. Moreover, other ABX crewmembers submitted similar formal and informal suggestions concerning pairing experienced and inexperienced pilots, including concerns that resulted in a March 2011 memorandum offering additional training for pilots dispatched to Bogota, Columbia. Upon information and belief, none of the other crewmembers raising this issue were ever disciplined by ABX, nor were their mental health or fitness questioned.

55. After evaluating the issue, Entwistle's medical providers and the FAA all concluded that concern by ABX and Ezell regarding his fitness for duty was unwarranted. Entwistle returned to flying in the summer of 2012. However, Entwistle has been deprived of pay, benefits and incurred other damages for the period that he was grounded.

## First Claim for Relief
**(ADA)**

56. Plaintiff repeats and incorporates herein all previously pleaded averments.

57. At all times relevant hereto, ABX perceived Entwistle as a person with a "disability" as that term is defined in the Americans with Disabilities Act at 42 U.S.C. § 12102(1). More specifically, ABX perceived Entwistle as having:

   a. A mental impairment that substantially limits his major life activities including his ability to work, concentrate and interact with others without treatment and medication;

   b. A record of such impairment;

   c. Is regarded by ABX has having such an impairment.

9

58. Entwistle is a qualified individual with a disability within the meaning of 42 U.S.C. § 12111(8) in that he is able to perform the essential functions of his position as a commercial pilot with or without reasonable accommodation.  Specifically, Entwistle was able to maintain a First Class Medical Certificate with special issuance authorization.  ABX was simply required to provide timely and accurate trimonthly reports to Entwistle's AME as outlined in his special issuance letter.

59. ABX and Ezell discriminated against Entwistle in violation of 42 U.S.C. § 12112 on account of his perceived disability.  Ezell's letter writing campaign as outlined herein was malicious and went far beyond that required by the special issuance letter.  Ezell was simply required to submit limited trimonthly reports to Entwistle's AME.  Instead ABX and Ezell directly targeted Entwistle's medical certificate and ability to earn a living.

60. As a direct consequence of ABX's discriminatory conduct, Entwistle suffered adverse action with respect to the terms, conditions and privileges of employment.  ABX and Ezell's conduct lead directly to the suspension of Entwistle's medical certificate, a result they specifically intended.

61. As a direct and proximate result of ABX's discriminatory conduct, Entwistle has been deprived of economic benefits, including but not limited to lost wages, loss of fringe benefits and loss of job opportunities, including promotion.

**Second Claim for Relief**
**(O.R.C. § 4112.01, *et seq.*)**

62. Plaintiff repeats and incorporates herein all previously pleaded averments.

63. In addition to the ADA, ABX's discrimination against Entwistle on the basis of disability and/or the perception of having a disability also violates Ohio law, including O.R.C. § 4112.01,

*et seq.* Plaintiff brings this second claim for relief to recover whatever additional legal or equitable relief may be available under that chapter.

**WHEREFORE,** Entwistle prays that the Court grant the following relief:

A. That judgment be entered against ABX in his favor in an amount to be determined by a jury, including an award of back pay, front pay, together with other monetary benefits and interest thereon for the period of time that he was unable to earn a living;

B. The ABX be enjoined from committing further acts of discrimination against Entwistle and that the company act in good faith with respect to his disability and special issuance letter;

C. Award Entwistle his attorney fees, including legal expenses and costs pursuant to 42 U.S.C. §12205;

D. Grant any and all relief available pursuant to O.R.C. § 4112.01, *et seq.*; and

E. Grant whatever additional legal and equitable may be just under the circumstances.

**Dated:** November 1, 2013

                                          Respectfully Submitted,

*s/ John T. Murray*
John T. Murray (0008793)
(Trial Attorney)
Direct Dial: (419) 624-3125
jotm@murrayandmurray.com
Leslie O. Murray (0081496)
Direct Dial: (419) 624-3010
lom@murrayandmurray.com
Michael Stewart (0082257)
Direct Dial: (419) 626-7008
stewart@murrayandmurray.com
**MURRAY & MURRAY CO., L.P.A.**
111 East Shoreline Drive
Sandusky, Ohio  44870-2517
Telephone: (419) 624-3000
Facsimile: (419) 624-0707

        Greg Mansell (0085197)
        Greg.Mansell@ohio-employmentlawyer.com
        **MANSELL LAW LLC**
        1457 South High Street
        Columbus, OH 43207
        Telephone: (614) 610-4134

        *Attorneys for Plaintiff*

## JURY DEMAND

Plaintiffs hereby demand trial by jury as to all issues.

        *s/ John T. Murray*
        John T. Murray (0008793)
        **MURRAY & MURRAY CO., L.P.A.**

        *Attorney for Plaintiffs*